* * * This brings us to the contention that the lease has been ratified by the adjudicatee, the present plaintiff.
"It is sufficient that the obligation [of confirmation or ratification] be voluntarily executed." C.C. 2272.
"To execute voluntarily is to execute with the intention to confirm and ratify." Breaux v. Savoie, 1 So. 614, 39 La. Ann. 243.
"The intention to ratify must be clear." Copeland v. Mickie,17 La. 293; Hamilton v. Hodges, 30 La. Ann. 1290.
"Ratification is deduced from the facts only when those factsclearly evince the intention to ratify." Hamilton v. Hodges, 30 La. Ann. 1290; Breaux v. Savoie, 1 So. 614, 39 La. Ann. 245.
[Hence] To amount to ratification, the acts relied upon mustclearly evince and make certain the intention to acquiesce in and, thus, to abandon any legal right to question or object to
the status involved.
In Otis v. Texas Co., 96 So. 7, 153 La. 401, the court said: "No ratification will be inferred where the act can be otherwise explained," and quoted a number of other cases.
In urging ratification, defendant relies chiefly upon the established fact that the trustee having a few days after March 1, 1923, collected six months' rent in advance from it, and having executed title to plaintiff during the month of March, did, on the 5th day of April, turn over to plaintiff (the adjudicatee) a check for $278.93, being the portion of the advance rent remaining in his hands and unearned on the date of deed to plaintiff; and that plaintiff collected said check and retained the proceeds.
Relative to the collection of the six months' advance payment of rent, Mr. Bascich, the trustee, testified: *Page 700 
"I should have received this check on the 1st of March — and I did not receive the rent. I telephoned to the office to find out why I did not receive it, and they told me somebody had instructed them not to pay the rent, and I told them that if the rent was not forthcoming at once, I would take steps to avoid that lease. * * * I got it the next morning."
This has small bearing on the issue of ratification, except that it affirmatively established that the demand for payment was not made or inspired by the successful bidder on the property, or his principal, the present plaintiff, and therefore relieves plaintiff of any conclusion of ratification that might otherwise flow from a demand for the payment of rent as stipulated in the lease.
Thereafter, on March 13th, the trustee, by virtue of order of court, executed final transfer of title to plaintiff, designated to receive the same by Souers, the nominal adjudicatee of February 27th, and on April 5th he issued a check for $278.93 payable to plaintiff, inscribing thereon this notation: "Their proportion of rent of Canning Factory and Ice Plant Site Pd. by Dunbar-Dukate Co., Ltd., from Mch. to Sept. 1/23 — $300.00"; which check bears the indorsement, "The Celeste Sugar Co., Inc. Herbert M. Shilston," and was stamped "Paid" by the Citizens' Bank Trust Company, on April 7th.
This establishes two facts: That the check was issued, payable to plaintiff; and that it was cashed or deposited by Shilston.
Relative to the occasion and circumstances provoking the issuance of the $278.93 check, Mr. Bascich is a bit hazy, thus:
On page 17 of his testimony, being asked how it was that he made the check to plaintiff, he says:
"This was just simply an idea of mine. The chances are now that the demand was made on me by the Celeste Sugar Company, because I made the check in favor of them."
Question: "Do you remember who made the request?"
Answer: "No, sir; I cannot say that I do."
And later, again asked if he was prepared to state that the check was issued at the request of the Celeste Sugar Company, purchaser of this property, he replied; "I am not positive of that, Mr. Dymond, but it might have been voluntarily on my part. I don't know, because I considered that I was not entitled tothat rent, and I turned it over to the Celeste Sugar Company because they had purchased the property."
Again, on page 23, being asked how the check got to Mr. Shilston, "Do you recall?" he says: "No, sir; I do not rememberwho I turned the check over to." *Page 701 
It is evident that this testimony fails to connect plaintiff with any demand looking to its receipt of the rent funds in Bascich's hands, or, indeed, with any knowledge of its existence prior to the issuance of the check on April 5th. No ratification is therefore established up to that date.
Nor does Shilston's indorsement of the check serve to show thatplaintiff came to knowledge of its existence, or of the notation thereon, on or before April 7th, its date of payment.
Indorsed by Shilston, deposited, paid and returned to its maker, plaintiff is not, from a study of the check itself, shown ever to have seen it, had it in possession, or to have seen the notation thereon. Therefore, unless its receipt and deposit by Shilston commits plaintiff to the intention to ratify the lease, other proof must be produced.
Even if Shilston deposited the proceeds of the check to plaintiff's account, that fact in itself would not necessarily evidence an intention to ratify the lease, considering that such act of deposit would not necessarily acquaint plaintiff's board of directors with the declaration of the notation on the check.
That plaintiff would have accepted the check at that time with knowledge of the notation thereon, or with the intention of ratifying the existence of the lease claimed by defendant, is, in the lights of facts and negotiations shown to have contemporaneously existed, doubtful if not altogether improbable.
In his testimony, at page 25 of the evidence taken in open court, relative to a conference with defendant's representatives at Mr. Dymond's office on April 3, 1923, Dr. Shilston, replying to the question, "Is it your recollection that anything was said about the lease here in question being canceled by the sale of the properties by the trustee in bankruptcy?"
Replied: "You told Mr. Dymond that you recognized that to have been the fact."
Question: "Did Mr. Dymond look into his records for any papers?"
Answer: "Mr. Dymond was not sure whether he had sufficient protection from bondholders in reference to his previous lease, and before he discussed the question with you, he called for his files and showed us all his correspondence, dating back from the early Wilkinson correspondence before the lease, and showed us a letter he had addressed to Mr. Young who was trustee for the bonds, and the answer of Mr. Young, declining to waive thebondholders' rights."
Further on (pages 25 and 26), he adds:
"The very last discussion that we had as we left the office was that nothing could be done *Page 702 
about a new lease until Mr. James Wilkinson's actual rights (relative to a portion of the canal) were proven"; and that the Celeste Sugar Company has never receded from that position — meaning, as the court understands, "That the lease was canceled by the trustee's sale of the realty."
Shilston's evidence is positive and unequivocal and is entitled to be read and weighed in connection with Mr. Dymond's testimony touching the same conference of April 3d.
On page 17 of the stenographer's transcript, Mr. Dymond says (near bottom of page): "I would say this, that Mr. Borah (plaintiff's attorney) made some suggestion that he thought the effect of the foreclosure was to wipe out (court's underscore) any rights that the Celeste Sugar Company had with the Dunbar-Dukate Company (the court understands reference to be to the lease) and I told him that I didn't think so. Then, all the negotiations that transpired subsequently were negotiations trying to compromise this matter (the court understands, the disputed status of the lease).
On cross-examination, page 18, Mr. Dymond, in reply to the query whether it was not he, instead of Mr. Borah, who raised the question of Wilkinson's claim to part of the canal, after the discussion as to whether or not the bankrupt sale had wiped out the lease, and after discussing the possibility of entering into a new lease, replied, among other things: "Now, I am not perfectly clear on that."
Again, on page 20, asked: "Now, Mr. Dymond, we never did have but one conference in your office?" replied:
"Now, I would not be positive about that," and, further on: "I would not be clear on that."
Further on, having admitted that, at one conference, possibly when Borah and Shilston were present, he did get out his files
and exhibit a certain resolution, and being asked:
"Well, at that conference, did you not produce a letter by Young refusing, as trustee, to enter in the lease and subordinating the mortgage to the lease?"
Mr. Dymond replied:
"Why, that is quite possible."
And, again, on page 21, he said:
"Well, I would not deny, Judge Borah, that you may have made the assertion at that conference that it was your legal opinion, or that you thought, although you were not fixed in your opinion, that you thought that the legal results of what had happened would wipe out the lease. * * *"
Without quoting further from Mr. Dymond's testimony, it corroborates Dr. Shilston's and the apparent contention of Mr. Borah, at least *Page 703 
to the extent that at the conference of April 3d, plaintiff did take the position that the lease had been annulled, or, at any rate, that it so believed, and that, at the close of the conference, it, instead of having receded therefrom, departed therefrom still adhering thereto — all to the knowledge of Mr. Dymond and defendant.
It (Mr. Dymond's testimony) also lends corroboration (in that it fails to deny it, but admits the possibility) to Shilston's assertion that Mr. Dymond at that conference exhibited a letter from Mr. Young, declining in behalf of the bondholders to ratifythe lease.
The point being that on April 3d, as a result of this conference, defendant was aware of plaintiff's attitude towards the lease — an attitude which could not have been fortified by the exhibition of the Young letter.
As a very pertinent fact, in endeavoring to appraise the state of mind of plaintiff both then and thereafter, and to detect its then and subsequent intention, the court must observe and make note of plaintiff's attitude as illuminated by conference of April 3d, and must admit it as an enlightening factor, in appraising and valuing subsequent happenings.
It is perfectly apparent that on April 3d, plaintiff was of the opinion that the lease had been canceled by the adjudication; that that belief must have become more fixed after the exhibition of the Young letter; that plaintiff had then no intention of ratifying or otherwise revivifying the old lease; and that defendant was well aware of such belief and attitude.
That attitude being existent on April 3d, and being well founded as the legal consequence of events up to that date, any change of attitude and intention in abandonment of its rights must be made clear and certain.
That the trustee could, by voluntarily issuing his check of April 5th, payable to plaintiff, commit it to a change of attitude, is, of course, untenable. The situation might be different had the check issued at the demand of plaintiff, but that is not shown to have been the case.
On the contrary, Mr. Bascich refrains from affirming that plaintiff or any particular person made any demand upon him for this payment, saying (as hereinbefore quoted):
"I am not positive of that — it might have been voluntary on my part."
There remains the single circumstance of the collection of the check on the 7th.
The check is shown to have been collected by or placed to the credit of plaintiff at that time. It was indorsed by Dr. Shilston and may, in so far as the record discloses, not have come into possession of plaintiff for weeks or months afterwards. *Page 704 
And the record is bare evidence that plaintiff, whenever it did
get physical possession of the $278.93 in cash or by way of deposit or credit, ever had view or notice of the trustee's notation thereon, identifying it as in settlement of rent under the lease up to September 1, 1923.
That being the case, plaintiff cannot be bound by such notation, or to a knowledge of its existence, as of date April7th, when Dr. Shilston collected it, or on April 16th, the date of Mr. Borah's letter protesting a nonwillingness to ratify, or, indeed, on any other reasonably identified date thereafter, if, forsooth, it ever came to such knowledge until long after itspresent nonacquiescent attitude was a matter of notoriety todefendant.
The court is of the opinion that plaintiff is not bound by this unauthorized act of Dr. Shilston, even though he may have deposited the proceeds thereof to plaintiff's account.
Though its officer, he was without authority to abandon and surrender plaintiff's legal rights, unless properly authorized so to do, which has not been shown.
Though placed among its assets, plaintiff may never have known the source of the $278.93, or of the qualifying notation on the check — unless it did, the conclusion of ratification does not follow.
"In order to execute a voluntary ratification, the act must be executed with the intention to confirm and ratify — clearly,
unequivocally.
"No ratification will be inferred where the act can be otherwise explained." Wells v. Files, 66 So. 749, 136 La. 126.
The court is convinced that plaintiff at no time intended to ratify the lease.
It may well be that, reflecting that in any event defendant, persisting in retaining possession of the site, would eventually be amenable to it for at least that amount, if not more, whether or not a new lease was confected, plaintiff continued to hold this amount in abeyance, subject to an eventual settlement of its controversy with defendant.
Relative to the recognition of the lease by trustee, counsel, on page 6 of their brief, quote:
"If they (meaning the trustee) elect to take over a contract, they are required to take it cum onere, as the bankrupt enjoyed it — and in the same plight and condition that the bankrupt
held it."
It is obvious that neither the bankrupt, nor the lessee, could have continued to use this site, or to maintain the lease in question, one moment longer than the bondholders chose to enforce their mortgage there against.
A sale under foreclosure would have eliminated *Page 705 
the ownership of the bankrupt, and put an end to the lease.
Since the trustee, electing to continue the lease, succeeds to the same plight and condition that the bankrupt occupied, it follows that the judicial sale executed by the trustee must be followed by the same legal results that would have been attendant upon a foreclosure against the owner, viz., the destruction of the rights granted the lessee after the institution of the mortgage.
The defendant argues that because the trustee affirmed and recognized this lease during his two years' administration of the property, its continued recognition by the adjudicatee at the trustee's sale became (to the lessee) a right which "runs with the land."
I do not so understand the law.
During the trustee's administration, the title of the property continued in the bankrupt's estate. True, it was subject to the control and administration of the court, through the trustee, but there had been no divestiture of title, whereby the enjoyment of the lease came into vital conflict with the bondholders. Indeed, the occupancy of the lessee, with the accompanying payments of rent for an otherwise nonrevenue bearing site instead of being inimical to the bondholders, was to their distinct advantage. The trustee did a wise thing in encouraging the continuation of the lessee's occupancy. As the legal repository of the property for the benefit of the bankrupt and its creditors alike, he could scarcely have done otherwise. However, his authority ended as it began — with his official existence, therefore with the legal alienation of the property at public auction. Just as he was without power to revoke things legally accomplished before his advent — except by special authority — so he was unable to attach to the realty burdens and obligations that could endure to the prejudice of prior rights beyond the termination of his administration. Especially could he not do this to the prejudice of the rights of the bondholders, which were to "have the property sold free from any incumbrances not existent at the time of the mortgage."
Defendant further maintains that the action of the trustee in demanding the rent on March 1st, after the property had been bid in by Mr. Souers, but before the deed of sale had been actually executed, shows that the sale did not cancel the lease.
The record shows that plaintiff was not a party to this demand. It is entitled to stand on its title and can in no way be bound by the acts or opinion of the trustee after the acceptance of the Souers bid, in so far as they could *Page 706 
or might conflict with the status thereby created.
Defendant further recited in its brief that plaintiff tried to prevent its payment on March 1, 1923, to the trustee — because the purchaser considered this rent belonged to it from the date of adjudication in February — suffice to say that the record does not sustain this assertion.
Defendant quotes numerous authorities, among which are:
"Corporations like individuals may estop themselves by remaining silent and where a corporation has knowledge that one of its employees has made a contract on its behalf and yet remains silent until the other party has performed his part thereof, it will be estopped from thereafter denying the authority of such employee to the prejudice of the other party."
And, "The acquiescence of the principal in the acts of the agent is a clear ratification of his action."
Obviously, these authorities are cited in reference to the act of Dr. Shilston in cashing the check, and the actions of plaintiff thereafter.
The record does not show that Dr. Shilston ever intended to ratify the lease, or to commit plaintiff thereto, or that plaintiff had knowledge of his act until long after it had emphasized its attitude of nonratification, to defendant's knowledge. In the face of the letter of April 16th and its subsequent course, it cannot be said that plaintiff has remained silent on the subject, to the prejudice of defendant, who has known ever since April 3d that plaintiff's attitude, frequently reiterated, was that the lease was canceled.
Though, perhaps, not demanding attention, it is nevertheless a fact that beyond yielding to the pressure of the trustee in making the payment of $300 on March 1st, the defendant had no relation of any kind with plaintiff concerning the check for $278.93 issued by the trustee — was not for several months even aware that the check had been paid.
It follows, necessarily, that its activities and attitude during such interval of time were not induced or modified by a fact of which it was not cognizant — but were had and done in sole reference to known facts, among which was the recollections of the conference of April 3d and the letter of April 16th disclaiming any intention to ratify the lease.
Under this view of the case, it seems unnecessary to consider in detail the other objections interposed by the defendant. They are all advanced in support of the plea of ratification and, taken together with those herein discussed, leave the court unconvinced that the lease was not canceled by the trustee's adjudication, and equally convinced that plaintiff is not shown ever to *Page 707 
have intended to ratify or revive it, or that the acts of Dr. Shilston and of plaintiff thereafter were such as to estop it from not asserting the nullity of the lease.
While the court concludes that the legal effect of the adjudication was to cancel the lease, and that the lease has not since been ratified or otherwise invested with a new existence, and that, as a consequent conclusion, plaintiff is within its rights in seeking the eviction of defendant, I am, nevertheless, of the opinion that defendant is equitably entitled to a reasonable time within which to remove such improvements as it has installed on the site.
The contract of lease was originally made in good faith, but by the lessee and the then lessor, and provided that the improvements placed upon the property should continue to belong to the lessee "provided the same be promptly removed and the site of same be replaced in the same condition as received."
Manifestly, the event then in mind was the eventual expiration of the term of lease, 15 years. However, while that specific time may have then been most predominant in the minds of the parties, the court equally believes that it was not contemplated by the parties that an earlier termination of the rights of the lessee should have the effect of penalizing the lessee with the loss of its improvements — the more especially if the termination were brought about through no fault or delinquency of the lessee, as is the case now under consideration. It is unfortunate enough that lessee finds itself with a worthless lease, without levying on it an additional loss that was never contemplated by the original contracting parties. Plaintiff, in recovering possession of the site, will have vindicated its rights, and should not, in addition thereto, benefit further from the improvements belonging to defendant, or even be allowed to penalize it for its obvious inability to remove therefrom within the short space of twenty-four hours.
The contract, though abrogated by the sale of the property, should still protect defendant in the possession and ownership of its improvements, at least to the extent of permitting it to remove the same promptly, and "promptly" should be interpreted as within a reasonable delay.
The original contract is silent as to any estimation of the time equivalent to "promptly," i.e., with prompt diligence and without undue delay; however, the court is of the opinion that four months cannot be considered as unreasonable by either of the parties hereto, within which to inaugurate and complete a removal from the present site.
For the reasons hereinabove given, and the law and the evidence being in favor of the plaintiff *Page 708 
and against the defendant: [Judgment accordingly.]
 Decree.
The judgment appealed from is therefore affirmed.